**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brad Hall & Associates Incorporated, | No. CV-22-00155-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| Mohamed Elkotb, et al., | |
| Defendants. | |

Pending before the Court is Defendants Mohamed Elkotb ("Elkotb") and Tucson Chevron Gas, LLC's ("Tucson Chevron") (collectively, "Defendants") Motion to Set Aside Default Judgment. (Doc. 37.) Plaintiff Brad Hall & Associates Incorporated ("Plaintiff" or "BHA") responded (Doc. 41) and Defendants replied (Doc. 44). For the following reasons, the Motion will be denied.

**I.     Background**

On September 26, 2017, Tucson Chevron entered into a Dealer Agreement with Senergy Petroleum, LLC ("Senergy"), pursuant to which Tucson Chevron agreed to purchase, exclusively from Senergy, gasoline to be sold and dispensed from Tucson Chevron's gas station located at 1570 W. Grant. Rd., Tucson, Arizona. (Doc. 17 at 1-2; Doc. 37 at 3.) The Dealer Agreement contained terms stating that Tucson Chevron would maintain gasoline brand names and trademarks at the gas station as directed by Senergy. (Doc. 37 at 3.) On September 29, 2017, Defendant Elkotb entered into a Guaranty whereby he agreed to pay Senergy any money owed to it by Tucson Chevron. (Doc. 17 at 1-2; Doc.

37 at 3.) On March 30, 2020, Senergy assigned its interests in the Dealer Agreement to Plaintiff. (Doc 1 at 2; Doc. 37 at 4.)

Plaintiff filed its Complaint in this action on March 31, 2022, alleging that Defendants were responsible for paying Plaintiff money due under the Dealer Agreement upon Tucson Chevron's termination of the Dealer Agreement on January 28, 2022. (Doc. 1; Doc. 17 at 2; Doc. 16-1 at 5 n. 3.) Service was executed on April 28, 2022 (Docs. 12, 13), but Defendants did not answer or otherwise respond to the Complaint. On June 10, 2022, Plaintiff filed an Application for Entry of Default (Doc. 14) and the Clerk of Court entered default on June 14, 2022 (Doc. 15). On June 15, 2022, Plaintiff moved for default judgment. (Doc. 16.) On July 1, 2022, the Court entered default judgment in favor of Plaintiff and against Defendants in the amount of $237,221.53. (Doc. 17.) On August 3, 2022, the Court granted Plaintiff's Motion for Attorneys' Fees and awarded Plaintiff attorneys' fees and taxable costs. (Doc. 22.) On September 2, 2022, the Court entered an Order ("Charging Order") granting in part and denying in part Plaintiff's Application for Order Charging Limited Liability Companies with Payment of Judgment. (Doc. 31.) Plaintiff also filed several applications for writs of garnishment, which then issued. (Docs. 26, 28, 30, 35.)

On September 28, 2022, defense counsel filed a Notice of Appearance. (Doc. 36.) On September 30, 2022, Defendants filed the pending Motion to Set Aside, along with requests to stay the Charging Order and Writs of Garnishment. (Docs. 37, 38, 39.) The Court granted Defendants' requests to stay the Charging Order and Writs of Garnishment and took the Motion to Set Aside under advisement. (Doc. 47.)

**II.     Applicable Law**

Federal Rule of Civil Procedure 60(b) allows for relief from judgment in certain circumstances and provides, in relevant part, that a party may be relieved from a final judgment, order, or proceeding for "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1); *see also Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984) (per curiam). "Rule 60(b) is remedial in nature and therefore must be liberally applied." *Falk*,

739 F.2d at 463; *see also Hawaii Carpenters' Tr. Funds v. Stone*, 794 F.2d 508, 513 (9th Cir. 1986) ("Rule 60(b) grounds are liberally interpreted when used on a motion for relief from an entry of default.")

In evaluating a Rule 60(b) motion to reopen a default judgment, courts consider three factors: "(1) whether the plaintiff will be prejudiced, (2) whether the defendant has [no] meritorious defense, and (3) whether culpable conduct of the defendant led to the default." *Falk*, 739 F.2d at 463. "[T]his tripartite test is disjunctive," meaning a district court may deny a Rule 60(b) motion "if any of the three factors [i]s true." *Am. Ass'n of Naturopathic Physicians v. Hayhurst*, 227 F.3d 1104, 1108 (9th Cir. 2000), *as amended on denial of reh'g* (Nov. 1, 2000). Defendants bear the burden of demonstrating that the three factors favor setting aside the default judgment. *Franchise Holding II, LLC. v. Huntington Restaurants Grp., Inc.*, 375 F.3d 922, 926 (9th Cir. 2004).

"[J]udgment by default is a drastic step appropriate only in extreme circumstances; a case should, whenever possible, be decided on the merits." *Falk*, 739 F.2d at 463. When applying the *Falk* factors, courts must keep in mind that "default judgments are the exception, not the norm, and should be viewed with great suspicion." *United States v. Aguilar*, 782 F.3d 1101, 1106 (9th Cir. 2015). However, so long as a court faithfully applies the *Falk* factors, it need not "articulate why a particular case presents 'extreme circumstances.'" *Id.*

### III. Discussion

In their Motion to Set Aside Default Judgment, Defendants aver that Senergy did not obtain Defendants' consent to assign the Dealer Agreement to Plaintiff. (Doc. 37 at 4.) Defendants further aver that, between approximately June 1, 2021 and October 21, 2022, the gas station's credit card machines were hacked and malfunctioned, resulting in a few hundred dollars being stolen per day. (*Id.*) Tucson Chevron sought to purchase new gas dispensers to address this issue, but delivery of the machines was delayed due to COVID-19. (*Id.*) Defendants aver that Plaintiff then made a "unilateral decision" to "unbrand" Tucson Chevron, refused to sell Tucson Chevron motor fuel, and told Tucson Chevron that

- 3 -

it had to remove Chevron signage from the gas station. (*Id*.) Defendants state, however, that Plaintiff did not terminate the Dealer Agreement but instead offered to sell Tucson Chevron "off-brand gas" at wholesale prices, a deal to which Tucson Chevron agreed. (*Id*.) Defendants state that they discovered Plaintiff was not providing the off-brand gas at wholesale prices, and when the higher price prevented Tucson Chevron from competing with nearby gas stations, Defendants refused to purchase the off-brand gas. (*Id*.) Defendants state that Plaintiff then unilaterally terminated the Dealer Agreement on January 28, 2022. (*Id*.)

Defendants also aver that, after Elkotb received the Complaint in this action, he called Plaintiff's attorney, Taylor Burgoon of Fennemore Craig, P.C., on May 5, 2022, and left a voicemail message. (*Id*. at 5.) Ms. Burgoon returned Elkotb's call on May 17, 2022. (*Id*.) During that call, Elkotb informed Burgoon that Defendants would not accept Plaintiff's settlement offer and that Defendants still needed to retain an attorney to answer the Complaint. (*Id*.) According to Defendants, Burgoon indicated that she "would wait" for a response from Defendants' attorney. (*Id*.) Based on this conversation, Elkotb believed that Burgoon had "granted" Defendants an "open extension" to retain an attorney and file an answer to the Complaint. (*Id*.) Defendants aver that they were "surprised" to learn that a default judgment had been entered against them, Plaintiff never advised them that the "open extension" was revoked, and Plaintiff never served Defendants with copies of its Application for Entry of Default, its Motion for Default Judgment, its Motion for Attorneys' Fees and Costs, or any of the Court's Orders, despite knowing Defendants' contact information. (*Id*. at 5-6.)

Plaintiff alleges that Defendants, not Plaintiff, terminated the Dealer Agreement, and Plaintiff supports that allegation with multiple letters from BHA and Chevron to Defendants regarding Defendants' alleged failure to comply with Chevron policies and the terms of the Dealer Agreement. A letter from BHA to Defendants, dated August 24, 2021, informs Defendants that Plaintiff believed Defendants had violated their obligations pursuant to the Dealer Agreement, had therefore breached the Agreement, were jointly and

severally liable for debts incurred, and owed BHA a total sum of $218,980.62. (Doc. 41-1 at 3-4.) That letter informs Defendants that Plaintiff would exercise its rights pursuant to the Dealer Agreement, including filing a lawsuit, to collect the balance due. (*Id.*) A letter from Chevron dated December 15, 2021, informs Defendants that Chevron intended to terminate the brand authorization for Tucson Chevron if it failed to install compliant gas dispensers within 90 days. (*Id.* at 5.) A letter from BHA dated January 28, 2022 "acknowledge[s] Tucson Chevron's termination of the Dealer Agreement"[1] and states that BHA consents to termination of the Agreement. (*Id.* at 6-8.) The letter states that Tucson Chevron terminated the Agreement by selling unbranded fuel, removing Chevron imaging from its gas station, removing itself from the Chevron credit card network, and failing to comply with Chevron's retail brand standards, thereby "unilaterally abandon[ing]" its Chevron franchise and terminating the Agreement. (*Id.* at 6.) The letter states that, notwithstanding the termination, BHA was willing to continue providing Chevron products and Chevron was willing to allow Tucson Chevron to continue using its brand. (*Id.* at 7.) The letter informs Defendants of the balance owed and that Plaintiff will exercise its rights, including filing a lawsuit, to collect the balance due. (*Id.* at 8.) Lastly, a letter from Chevron dated January 31, 2022, informs Defendants that they must completely remove Chevron's insignia and images from the gas station premises. (*Id.* at 9.)

Plaintiff also provides a declaration by Taylor Burgoon stating that Elkotb never asked for an extension of the answer deadline and that Burgoon never offered or agreed to an extension of the deadline, and "certainly not an indefinite 'open' extension." (Doc. 41-1 at 11-13.) Burgoon states that, when Elkotb began speaking about the merits of the case, she asked in response if he was represented by counsel. (*Id.*) He responded that he was going to retain an attorney the following week. (*Id.*) Burgoon responded that once Elkotb retained counsel, all communications would need to be through the attorneys. (*Id.*) Elkotb again stated that he would retain an attorney the following week, and Burgoon responded by saying something like "we will await your attorney's response." (*Id.*) Burgoon

---

[1] The letter refers to the Dealer Agreement as the "Supply Agreement."

maintains that, had an open extension of the answer deadline been offered or agreed to, Plaintiff would not have moved for entry of default judgment, but no such extension was discussed or agreed upon. (*Id*. at 13.) Burgoon states that Plaintiff has not been able to collect on any of the judgment amount and believes that Elkotb owns nine business entities, of which Tucson Chevron is one. (*Id*.)

### A. Prejudice to Plaintiff

The standard for prejudice is whether the Plaintiff's "ability to pursue his claim will be hindered." *Falk*, 739 F.2d at 463. "[F]or the setting aside of a default judgment to be considered prejudicial, it must result in more than delay. Rather, the delay must result in tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion." *Thompson v. Am. Home Assur. Co.*, 95 F.3d 429, 433–34 (6th Cir. 1996). The Ninth Circuit Court of Appeals has upheld a finding of prejudice where a plaintiff argued that a delay in judgment would allow the defendant to move or hide assets, and the defendant had not made a payment to its creditor in two years or filed any pleadings until after default was entered. *Franchise Holding II*, 375 F.3d at 926–27.

Defendants argue that Plaintiff will not be prejudiced by setting aside the default judgment because it only filed its Complaint in March of 2022, and the allegations arise out of events leading up to that time. (Doc. 37 at 7.) Therefore, according to Defendants, any delay from reinstating the case will not be prejudicial, nor will any other harm, such as difficulty of discovery or greater opportunity for fraud, result. (*Id*.) In response, Plaintiff contends that setting aside the default judgment would be prejudicial because the delay would provide Defendants with an opportunity to move and hide assets among Mr. Elkotb's multiple business entities. (Doc. 41 at 17-18.) Plaintiff avers that it has been seeking payment of the debt owed since August 28, 2021 but has been unable to collect on the judgment. (*Id*.)

The Court finds that prejudice to Plaintiff may result from setting aside the default judgment. Like the debtor defendant in *Franchise Holding II*, 375 F.3d at 926–27, here, Defendants have failed to make any payments and failed to participate in this action until

1 after default judgment was entered. The record clearly shows that BHA and Chevron contacted Defendants multiple times leading up to the filing of the Complaint in this action, notifying them that they had breached the Agreement and that Plaintiff would be engaging its legal rights to obtain payment. Moreover, once Elkotb received the Complaint and spoke with Burgoon, he informed Burgoon that he intended to hire a lawyer soon thereafter. However, Defendants did not participate in the action until default judgment was entered, a motion for attorneys' fees was granted, and a Charging Order issued as to eight LLCs in which Elkotb holds an interest. (*See* Docs. 22, 24, 31.) Defendants contend that Plaintiff never served them with copies of these documents. However, Plaintiff had no obligation to do so, whereas Defendants had an obligation to appear in and defend this action if they intended to contest the allegations. When they did not do so, even after the phone call with Burgoon, Plaintiff properly moved for default judgment. Finally, a delay in entering judgment in this matter could give Defendants the opportunity to move or hide assets among the multiple business entities in which Elkotb holds an interest. For these reasons, the first factor of prejudice to the Plaintiff is satisfied.

### B. Meritorious Defense

"A party in default [] is required to make some showing of a meritorious defense as a prerequisite to vacating an entry of default," based on the "underlying concern" of determining "whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." *Stone*, 794 F.2d at 513. "[T]he burden on a party seeking to vacate a default judgment is not extraordinarily heavy," but the party "must present specific facts that would constitute a defense." *TCI Grp.*, 244 F.3d at 700. In *Falk*, the Ninth Circuit held that the defendant raised a meritorious defense where she alleged facts that were sufficient to raise a defense; the question whether the factual allegation was true was the subject of the later litigation. *See Falk*, 739 F.2d at 463.

Defendants present a number of defenses that they argue are meritorious. First, Defendants argue that there was no privity of contract between Plaintiff and Defendants on the Dealer Agreement or the Guaranty because Defendants did not agree to assignment of

- 7 -

the Dealer Agreement and Guaranty to Plaintiff. (Doc. 37 at 9.) Defendants also contend that the Dealer Agreement involved non-assignable personal services because it included an agreement to use Chevron's advertising, promotional materials, and branding at the gas station. (*Id.* at 9-10.) Defendants argue that, because the alleged assignment is invalid, Plaintiff lacks standing to sue for breach of contract and the claim fails as a matter of law. (Doc. 37 at 10.) Defendants also argue that, because Elkotb's Guaranty was non-assignable, it cannot be enforced against Elkotb after the assignment to BHA occurred. (*Id.* at 10-11.) Defendants further argue that, even if the assignment were valid, Plaintiff materially breached the Dealer Agreement first and thereby relieved Defendants of any further duty to perform. (*Id.* at 12.) Defendants do not dispute Plaintiff's allegations that Tucson Chevron removed Chevron imaging from the gas station, removed itself from the Chevron credit card network, stopped selling Chevron gasoline, and failed to comply with the Dealer Agreement and Chevron policy. (*Id.*) However, Defendants contend that Plaintiff breached the Agreement first by refusing to sell Tucson Chevron any Chevron brand gasoline, "unbranding" Tucson Chevron, and failing to sell Tucson Chevron gasoline at wholesale price. (*Id.*)

Plaintiff maintains that Defendants' purported defenses are without merit. (Doc. 41 at 13-17.) First, Plaintiff argues that Defendants are estopped from arguing that the assignment of the Dealer Agreement and Guaranty was improper, because Defendants operated under and benefitted from the Dealer Agreement for years after it was assigned to BHA. (*Id.* at 13-14.) Second, Plaintiff argues that the plain language of the Dealer Agreement establishes that the assignment was within the terms of the Agreement. (*Id.* at 14; Doc. 37-1 at 4 ¶ 15.) Furthermore, the guarantees by Elkotb and Tucson Chevron are expressly incorporated in the Agreement (*see* Doc. 37-1 at 4 ¶ 16, 7, 8) and the guarantees explicitly apply to Senergy's successors and assigns (*see* Doc. 37-1 at 7 ¶ 1). Third, Plaintiff argues that the assignment was proper under Arizona law, which establishes that contracts for goods, such as motor fuel, are not contracts for "personal services." (Doc. 41 at 14-15 (citing *SiteLock LLC v. GoDaddy.com LLC*, 562 F. Supp. 3d 283, 301–02 (D.

Ariz. 2022) (typical distributorship agreements are most often classified as contracts for the sale of goods… such as "a contract for the sale of goods where the distributor purchased and received products from the manufacturer and then resold those products directly to the customers") (internal quotation omitted); A.R.S. § 47-2105(A) (goods include "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale").) Plaintiff argues that Chevron's advertising, promotional materials, and branding are properly classified as goods, not personal services. (*Id*. at 15.) Plaintiff further refutes Defendants' argument that special guarantees are not assignable, pointing out that under the current Restatement of Suretyship & Guaranty, special guarantees are assignable, *see* Restatement (Third) of Suretyship & Guaranty § 13, and that Arizona courts follow the Restatement, *see Brentwood Scottsdale LLC v. Smith*, No. 1 CA-CV 14-0067, 2015 WL 728364, at *1 (Ariz. App. Feb. 19, 2015) (applying Restatement (Third) of Suretyship & Guaranty § 13 to find that plaintiff properly assigned a guaranty).

Plaintiff also disputes Defendants' contention that it breached the Dealer Agreement first, arguing that Defendants admit they breached the Agreement. (*Id*. at 16.) Plaintiff points out that it is undisputed Defendants stopped allowing credit card transactions at their fuel pumps in approximately June of 2021, which violated Chevron's brand standards and credit card guidelines, and thereby breached the Agreement. (*Id*. (citing Doc. 37-1 at 2 ¶ 3 (stating that "Buyer shall maintain Buyer's premises in accordance with Chevron Brand Standards [and] Chevron Credit Card Guidelines[.]").) Upon this breach, pursuant to the terms of the Agreement, BHA was no longer required to supply Chevron-branded fuel and was permitted to terminate the Agreement, remove the Chevron brand from the gas station, and require Defendants to pay amounts owed. (*Id*. (citing Doc. 37-1 at 2 ¶¶ 3, 9 (requiring Buyer to repay to Senergy the unamortized cash incentive of $170,000 in the event the Agreement is terminated for any reason by Buyer at any time).)

Plaintiff opposes Defendants' argument that Plaintiff breached the Agreement by selling Defendants off-brand fuel allegedly at a price higher than the wholesale price as set forth in the Agreement. (*Id*.) Plaintiff contends first that it is undisputed Defendants

ordered, purchased, and accepted the off-brand fuel at an agreed-upon price, did not raise any issue regarding the product or the price, and were therefore obligated to pay for the fuel regardless of whether BHA breached the Agreement. (*Id.* at 16-17 (citing Doc. 37-1 at 2 ¶ 4 (stating that "Buyer shall pay Senergy for all goods delivered to Buyer by Senergy hereunder on the date Buyer is required to pay for such goods")).) Plaintiff further argues that the Agreement's reference to wholesale pricing refers to Chevron-branded fuel, not off-brand fuel, and therefore Defendants' argument that BHA breached the contract by selling off-brand motor fuel above wholesale price fails. (*Id.* at 17 (citing Doc. 37-1 at 2 ¶ 4 (agreeing that "[t]he price for Buyer's gasoline loads shall be Senergy's Chevron wholesale price")).) Therefore, Plaintiff argues, it cannot have breached the Dealer Agreement by selling Defendants off-brand fuel at a price higher than wholesale price, because the Agreement did not contemplate or include such an arrangement.

        After closely considering the parties' arguments, the contractual terms at issue, and the relevant documents, the Court finds that Defendants have not presented specific facts constituting a defense. The Court is unconvinced by Defendants' arguments that the Dealer Agreement and the Guaranty were not assignable. Contrary to Defendants' contention that the Dealer Agreement explicitly precludes Senergy from assigning its interests, the Dealer Agreement contains a clause stating, "Senergy reserves the right to transfer and assign this Agreement at any time." (*See* Doc. 37-1 at 4, ¶ 15.) Furthermore, there is no indication in the contract terms that the Guaranty was a special guaranty for payment only to Senergy; such an interpretation would contradict the plain language of the contract, which includes no language limiting Elktob's liability to Senergy only. There is also no indication, either in the facts of the case or the terms of the Agreement, that the Agreement involved personal services that cannot be assigned. The argument that the contract was for personal services because it included use of Chevron's imaging and marketing is unsupported by applicable case law. The Agreement is primarily a contract for the sale and purchase of motor fuel, which indisputably is a good and not a personal service.

Defendants' argument that Plaintiff breached the Dealer Agreement first is unsupported by the record. Defendants do not dispute that they removed Chevron imaging from the gas station, stopped using the Chevron credit card network, stopped selling Chevron gasoline, and failed to comply with the Dealer Agreement and Chevron policy. These actions constituted a material breach of the Agreement. The record shows that Plaintiff's refusal to sell Chevron brand gasoline and the "unbranding" of Tucson Chevron were in response to Defendants' actions. And while Defendants' actions may have been in response to a credit card machine malfunction outside of their control, it appears that Defendants took no steps to resolve this issue with Chevron, Senergy, or BHA before breaching the Agreement. The record shows several communications from Chevron and BHA to Defendants regarding their failures to comply with the Agreement and applicable policies, but the record contains no indication of any responsive communications from Defendants explaining the situation or attempting to negotiate a way to move forward with the business relationship. Thus, Defendants' argument is unavailing.

As for Defendants' allegation that Plaintiff's failure to sell it off-brand gasoline at a wholesale price constituted a breach of the Agreement, this argument is also unsupported by the record. As Plaintiff points out, the Agreement guarantees Defendants the ability to purchase Chevron-branded gasoline, not off-brand gasoline, at a wholesale price. Thus, when Plaintiff offered to sell Defendants off-brand gasoline after ceasing supply of Chevron-branded gasoline due to Defendants' breach, that deal was not governed by the Agreement provision guaranteeing gasoline at a wholesale price, and Plaintiff was under no obligation to provide the gas at that price. Defendants could have declined the offer to purchase off-brand gasoline without breaching the Agreement. That they accepted the offer does not mean the Agreement terms applied to the deal.

Accordingly, Defendants have not presented specific facts constituting a viable defense that they did not breach the Dealer Agreement, and the second factor of presenting a viable defense is not satisfied.

. . . .

### C. Culpable Conduct

The Ninth Circuit has held that a "defendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and intentionally failed to answer." *Icho v. Hammer*, 434 F. App'x 588, 590 (9th Cir. 2011) (quoting *Alan Neuman Prods. Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988)). "Culpability involves 'not simply nonappearance following receipt of notice of the action, but rather conduct which hindered judicial proceedings[.]'" *Id.* (quoting *Gregorian v. Izvestia*, 871 F.2d 1515, 1525 (9th Cir. 1989)). The Ninth Circuit has "held that a defendant's conduct was culpable for purposes of the good cause factors where there is no explanation of the default inconsistent with a devious, deliberate, willful, or bad faith failure to respond." *United States v. Signed Pers. Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1092 (9th Cir. 2010). "[I]n this context the term 'intentionally' means that a movant cannot be treated as culpable simply for having made a conscious choice not to answer; rather, to treat a failure to answer as culpable, the movant must have acted with bad faith, such as an 'intention to take advantage of the opposing party, interfere with judicial decisionmaking, or otherwise manipulate the legal process.'" *Id.* (quoting *TCI Grp.*, 244 F.3d at 697). "Neglectful failure to answer," where a credible explanation has been offered, "is not necessarily . . . culpable or inexcusable." *TCI Grp.*, 244 F.3d at 697–98. Where an attorney missed a response deadline but "acted in good faith, without prejudice to the opposing party, and with minimal delay or impact on the judicial proceedings," his neglect was excusable, even though he knew of the deadline and did nothing to obtain an extension. *Id.* at 698. Similarly, where a defendant knowingly failed to answer a complaint "for understandable reasons" and "in no way" attempted to "obtain strategic advantage in the litigation," the neglect was excusable. *Id.*

Defendants argue that they did not engage in culpable conduct leading to the default. (Doc. 37 at 8-9.) Defendants contend that they did not intentionally fail to answer the Complaint or attempt to hinder or circumvent judicial proceedings. (*Id.*) Defendants state that their failure to timely respond to the Complaint was based on Elkotb's interpretation of his conversation with Burgoon, based on which he believed that he had an open

- 12 -

extension to retain an attorney and file an answer. (*Id.*) Defendants contend that Plaintiff is culpable for its failure to answer because it never revoked the open extension and did not serve any of its filings related to the default judgment on Defendants. (*Id.*)

In response, Plaintiff argues that it did not offer or agree to an extension for Defendants to retain an attorney or file an answer. (Doc. 41 at 7-8.) Plaintiff avers that it waited over three weeks from the time of Burgoon's conversation with Elkotb to seek entry of default. (*Id.*) Plaintiff contends that Defendants' arguments regarding the conversation are precluded by Local Rule of Civil Procedure 83.7, which states in relevant part that "[n]o agreement between parties or attorneys is binding, if disputed, unless it is in writing signed by the attorney of record or by the unrepresented party, or made orally in open court and on the record[.]" LRCiv 83.7. Plaintiff further contends that Defendants made no effort to participate in this litigation until after default judgment had been entered, they were not diligent in participating in this litigation, they delayed in moving to set aside the default judgment, and such conduct demonstrates a willful disregard of the judicial process. (Doc. 41 at 9-10.) Plaintiff further states that it was not required to provide Defendants notice of its application for entry of default or other related filings. (*Id.* at 11-12.)

The Court finds that Defendants did not engage in culpable conduct leading to the default by failing to timely answer the Complaint. Defendants' failure to file an answer was clearly neglectful, and the Court agrees that LRCiv 83.7 renders any purported oral agreement to extend the deadline to answer not binding, as there is no dispute that the conversation, including the purported agreement to an extension of time, was not recorded in writing or made on the record in open court. However, there is no indication that Defendants' failure to file an answer was in any way an attempt to gain a strategic advantage in the litigation, that it was an attempt to circumvent or hinder the judicial process, or that it was done in bad faith. Defendants' failure to abide by the deadline for filing an answer cannot be attributed to intentionally willful conduct. Defendants' explanation that they relied on their interpretation of Elkotb's conversation with Burgoon is at least understandable, even if not supported by the applicable Rules. Courts have not

found culpable conduct where a defendant's failure to respond can be explained in good faith, even where it was clearly neglectful.

### D. Conclusion

Even if Defendants' delay in responding to the Complaint or participating in this litigation does constitute culpable conduct, the other *Falk* factors establish that setting aside the default judgment is unnecessary under Rule 60(b). Plaintiff will be prejudiced by setting aside the default judgment, and Defendants have not made a showing of a viable defense such that there is a legitimate possibility of a different outcome at trial. Accordingly, the *Falk* factors favor denying Defendants' Motion to Set Aside.

**IT IS ORDERED** that the Motion to Set Aside Default Judgment (Doc. 37) is **denied**. The previously issued stay on the Charging Order and Writs of Garnishment (Doc. 47) is **lifted**. This case shall remain closed.

Dated this 9th day of March, 2023.

_____
Honorable Rosemary Márquez
United States District Judge